**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TENDER TOUCH REHAB SERVICES, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 11-7016** |
| | : | |
| **BRIGHTEN AT BRYN MAWR,** | : | |
| **BRIGHTEN AT AMBLER, BRIGHTEN** | : | |
| **HEALTH GROUP, LLC, BRYN MAWR** | : | |
| **HEALTH CARE GROUP, LLC, AMBLER** | : | |
| **HEALTHCARE GROUP, LLC, CHATAU** | : | |
| **SENIOR SERVICES, LLC, SABER** | | |
| **HEALTHCARE GROUP, SABER** | | |
| **HEALTHCARE HOLDINGS, LLC, AVIV** | | |
| **HEALTHCARE PROPERTIES, LP, JOHN** | | |
| **DOES 1-10,** and **ABC CORPORATIONS** | | |
| **1-10,** | | |
| **Defendants.** | | |

<u>**MEMORANDUM OPINION**</u>

**Tucker, C.J.**                                              **June 13, 2014**

Presently before this Court is Defendants Saber Healthcare Group, Saber Healthcare

Holdings, LLC, Bryn Mawr Healthcare Group, LLC (collectively, "Saber"), and BHG Aviv

LLC's ("Aviv")[1] Motion for Summary Judgment in their favor on all claims asserted by Plaintiff

Tender Touch Rehab Services, LLC ("Plaintiff").    In its Complaint, Plaintiff claims that

Defendants Brighten at Bryn Mawr, Brighten at Ambler, and other related entities are liable to it

for payment of performed services under theories of breach of contract, account stated,

---

[1]    Plaintiff brought its Complaint against Aviv HealthCare Properties, LP.    (<u>See</u> Compl.)    In their Motion for
Summary Judgment, Defendants presume that Plaintiff intended to name BHG Aviv, LLC instead, the entity which
owned the nursing homes described in the Complaint, leased the properties to Brighten, and had a secured lending
relationship with Brighten.    In its Response, Plaintiff identifies BHG Aviv, LLC as a subsidiary of Aviv Healthcare
Properties, LP.    (<u>See</u> Resp. 1.)    For purposes of this Opinion, this Court will refer to this defendant as BHG Aviv,
LLC ("Aviv").

promissory estoppel, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.   Plaintiff alleges that Saber is responsible for Brighten's breaches under successor liability theories, and that Saber and Aviv are liable for civil conspiracy.   Upon consideration of the parties' motions with briefs and exhibits, this Court will deny Defendants' motion in all respects for the reasons set forth below.

## I.   BACKGROUND

Plaintiff submits that this "action arises out of Defendants' breach of the parties' agreements and failure to pay Tender Touch for therapy services provided to the nursing home residents of Brighten-Bryn Mawr and Brighten-Ambler."   (Compl. 1.)   The relevant facts are as follows.

Brighten at Bryn Mawr is the registered fictitious name of Chateau Senior Services, LLC, which formerly operated a nursing home at 956 Railroad Avenue, Bryn Mawr, Pennsylvania. Brighten at Ambler is the registered fictitious name of Ambler Senior Services, LLC, which formerly operated a nursing home at 32 South Bethlehem Pike, Ambler, Pennsylvania. Brighten at Bryn Mawr, Brighten at Ambler, and related entities (collectively, "Brighten") were all part of the Brighten Health Group.   (Landenberger Dep. 39:4-10.)

### A.  Master Lease between Brighten and Aviv

On February 9, 2007, Brighten, as Lessee, and Aviv as Lessor, entered into a Master Lease.   (Defs.' Ex. F, Master Lease.)   Under the lease's terms, Brighten leased from Aviv the land, facilities, and personal property used to operate, *inter alia*, "a 160-bed nursing facility on land commonly known as **Brighten at Bryn Mawr**, 956 Railroad Avenue, Bryn Mawr, Pennsylvania, 19010," and "a 100-bed nursing facility on land commonly known as **Brighten at**

**Ambler**, located at 32 South Bethlehem Pike, Ambler, Pennsylvania 19002).[2]   (Id. at D02364)
(emphasis added).   As stated in the lease, Aviv was the contract purchaser of Brighten at Bryn
Mawr and Brighten at Ambler, and owned all "personal property" at the facilities, including
furnishings, furniture, equipment, and fixtures.   (Id. at D02364-65.)   The lease also gave Aviv
a first lien paramount to all others, subject to any Mortgage/Underlying Lease made by Lessor,
on every right and interest of Lessee in and to the lease, and on "any furnishings, equipment,
fixtures, accounts receivable, certificates of need, licenses, provider agreements, certifications or
other property of any kind belonging to Lessee and used in connection with the Lease or located
at the Demised Premises."[3]   (Id. at D02377.)   The Master Lease provided as follows in the
event of Brighten's default under the lease:

<u>ARTICLE 21 – LESSOR'S REMEDIES UPON DEFAULT</u>

21.1. In the event of any Event of Default on the part of Lessee, Lessor may, if it so
elects, with or without any demand whatsoever upon Lessee, forthwith either to (i) terminate this
Lease and Lessee's right to possession of the Demised Premises; or (ii) terminate Lessee's right
to possession of the Demised Premises without terminating this Lease.   Upon any such
termination of this Lease, or upon any such termination of Lessee's right to possession without
termination of this lease, Lessee shall vacate each of the Facilities comprising the Demised
Premises immediately, and shall quietly and peaceably deliver possession thereof to Lessor, and
Lessee hereby grants to Lessor full and free license to enter into and upon the Demised Premises
in such event with or without process of law and to repossess the Demised Premises and the
related Personal Property as Lessor's former estate.   In the event of any such termination of
this Lease, Lessor shall again have possession and enjoyment of the Demised Premises subject to
such termination and the related Personal Property to the extent and as if the Lease had not been
made, and thereupon the lease of the Demised Premises and everything herein contained on the
part of Lessee to be done and performed in connection therewith shall cease and terminate, all,
however, without prejudice to and without relinquishing the rights of Lessor to rent . . . or any
other right given to Lessor hereunder or by operation of law.

---

[2]  Brighten also leased the following facilities pursuant to the Master Lease: Brighten at Broomall, Brighten at Julia
Ribaudo, and Brighten at Medford.
[3]  Under the lease, "Demised Premises" is defined as "the Land described in Exhibits 'A-1' through 'A-5' and the
Facilities, together with any Improvements now or hereafter located on the Land and all easements, tenements,
hereditaments and appurtenances thereto."   (Id. at D02365.)

3

21.2 In the event Lessor elects either to terminate this Lease or to terminate Lessee's right to possession of the Demised Premised upon the occurrence of an Event of Default, then, to the extent permitted by applicable law, all licenses, certifications, permits and authorizations issued by any governmental agency, body or authority in connection with or relating to the Facilities and the nursing homes operated thereon shall be deemed as being assigned to Lessor.

(Id. at D02376.)

The Master Lease included a provision, Article 36, for the transfer of operations upon

termination of the lease.    Article 36 provides, in relevant part:

ARTICLE 36- TRANSFER OF OPERATIONS UPON TERMINATION OF LEASE

36.1 The date on which this Lease either terminates or expires pursuant to its terms or is terminated by either party whether pursuant to a right granted to it hereunder or otherwise shall be referred to as the "Closing Date" in this Article.   On the Closing Date, this Lease shall be deemed and construed as an absolute assignment for the purposes of vesting in Lessor (or Lessor's designee) all of Lessee's right, title and interest in and to the following intangible property which is now or hereafter used in connection with the operation of the Demised Premises (the "Intangibles") and an assumption by Lessor of Lessee's obligations under the Intangibles from and after the Closing Date . . . :

(1) service contracts . . . for the benefit of the Demised Premises to which Lessee is a party, and which can be terminated without penalty by Lessee within sixty (60) or fewer days' notice or which Lessor requests be assigned to Lessor pursuant to this Article 36.

…

36.2 Lessor shall be responsible for and shall pay all accrued expenses with respect to the Demised Premises accruing on or after 12:01 a.m. on the day of the Closing Date and shall be entitled to receive and retain all revenues from the Demised Premises accruing on or after the Closing Date.

. . .

36.4 For the period commencing on the Closing Date and ending on the date Lessor, or its designee, obtains any and all appropriate state or other governmental licenses and certifications required to operate the Facilities, Lessee hereby agrees that Lessor, or Lessor's designee, shall have the right, but not the obligation, to manage and operate the Demised Premises, on a triple net basis, and shall be entitled to all revenues of the Demised Premises during such period, and to use any and all licenses, certifications and provider agreements issued to Lessee by any federal, state or other governmental authority for such operation of the Demised Premises, if permitted by any such governmental authorities.   If Lessor or its designee exercises

4

the right described above in this Section 36.4, the provisions of this Section 36.4 shall be self-operative and shall constitute a management agreement between Lessee, on the one hand, and Lessor or its designee, on the other hand, on the terms set forth above in this Section 36.4 provided, however, that upon the request of Lessor or its designee, Lessee shall enter into a separate management agreement on the terms set forth in this Section 36.4 and on such other terms and provisions as may be specified by Lessor or its designee.

. . .

36.6 All cash, checks and cash equivalent at the Demised Premises and deposits in bank accounts (other than patient trust accounts) relating to the Demised Premises on the Closing Date shall remain Lessee's property after the Closing Date.   Subject to the provisions of Article 24 hereof, all accounts receivable, loans receivable and other receivables of Lessee, whether derived from operation of the Demised Premises or otherwise, shall remain the property of Lessee after the Closing Date.   Lessee shall retain full responsibility for the collection thereof.   Lessor shall assume responsibility for the billing and collection of payments on account of services rendered by it on and after the Closing Date.   In order to facilitate Lessee's collection efforts, Lessee agrees to deliver to Lessor, within a reasonable time after the Closing Date, a schedule identifying all of those private pay balances owing for the month prior to the Closing Date and Lessor agrees to apply any payments received which are specifically designated as being applicable to services rendered prior to the Closing Date to reduce the pre-Closing Date balances of said patients by promptly remitting said payments to Lessee.   All other payments received shall be retained by Lessor as being applicable to services rendered after the Closing Date. Lessor shall cooperate with Lessee in Lessee's collection of its preclosing accounts receivable. Lessor shall have no liability for uncollectible receivables and shall not be obligated to bear any expense as a result of such activities on behalf of Lessee.   Subject to the provisions of Article 24 hereof, Lessor shall remit to Lessee or its assignee those portions of any payments received by Lessor which are specifically designed as repayment or reimbursement arising out of cost reports filed for the cost reporting periods ending on or prior to the Closing Date.

(Id. at D02383-85.)

## B.  Brighten Files for Bankruptcy and Subsequent Reorganization

On August 20, 2008 Brighten filed a petition for relief under Chapter 11 of the United

States Bankruptcy Code.   On March 5, 2010, the United States Bankruptcy Court for the

Eastern District of Pennsylvania approved a joint plan of reorganization for Brighten.   As

contemplated in the plan of reorganization, and effective March 26, 2010, Aviv entered into

several agreements with Brighten as part of the joint plan of reorganization, including: (1) a

Third Amendment to the Master Lease which introduced new terms and conditions to the prior

lease arrangement; (2) a Term Loan Note in the original principal amount of $3,354,773, by

Brighten and in favor of Aviv as lender; (3) a Revolving Loan Note in an amount not to exceed

$900,000, by Brighten and in favor of Aviv as lender; (4) a Credit Agreement and Security

Agreement which, among other things, provided Aviv a first-priority lien on all assets of

Brighten; and (5) Operations Transfer Agreements and Consents to Transfer, which allowed

Aviv to transfer the operations of the nursing home facilities to other operators in the event of

Brighten's default.   Pursuant to the Credit Agreement, each Brighten entity[4]  would remain the

licensed operator of its respective facility during the term,[5] and Brighten Management[6]  would

remain the Manager of the Healthcare Facilities during the term.   (Defs'. Ex. K, Credit

Agreement, at D00373.)

**C.  The Operations Transfer Agreements**

The Operations Transfer Agreements[7]  specifically referenced how assets would be

delivered from the "Operator" (Brighten) to the "New Operator" (Aviv) upon the

commencement date (an event of default under the lease on the date designated by New

Operator):

<u>AGREEMENT</u>

. . .

2.   <u>Assets</u>

---

[4]  Other than Brighten entity Church Lane.
[5]  As defined in the Credit Agreement, "the term of the Credit Facility (the "Term") shall be for a period of twenty-four (24) months commencing with the Closing Date."   (<u>Id.</u> at D00340.)   The Closing Date was the date the Agreement was executed.   (<u>Id.</u> at D00353.)
[6]  Brighten Management refers to Brighten Management Group, LLC, a Pennsylvania limited liability company, its successors and assigns.   (<u>Id.</u> at D00398.)
[7]  Defendants provide, as exhibits to their motion, the Operations Transfer Agreements between Brighten at Ambler and Aviv, and Brighten at Bryn Mawr and Aviv.   (<u>See</u> Defs.' Exs. M,V.)

(A) Delivery of Assets. On the Commencement Date, Operator shall deliver, convey, and transfer to New Operator, and New Operator shall accept the following assets (the "Assets"):

(i) All assumed Contracts and Assumed Leases as such terms are defined in Section 12 of this Transfer Agreement;

(ii) In accordance with Section 3 of this Transfer Agreement, all intangible property, in which Operator has an interest, now or hereafter used in connection with the operation of the Facility ("Intangibles"), such as Operator's licenses, permits and accreditations with respect to the Facility to the extent assignable by Operator;

. . .

(iii) All other real and personal property or other Intangible or tangible assets used or maintained in connection with the Operation of the Facility.

(B) <u>Excluded Assets</u>. All assets of Operator set forth on Schedule 2.2(B)[8] attached hereto and made a part hereof, shall not be transferred to New Operator pursuant to this Transfer Agreement.

(C) <u>No Sale</u>. The Parties understand and acknowledge that the Assets transferred under this Transfer Agreement by Operator shall be for the use of New Operator in furtherance of and in connection with the New Operator Lease. The parties agree that the Assets transferred hereunder to New Operator shall not be treated as a sale of all such Assets by Operator to New Operator for federal, state and local tax purposes and the Parties agree to prepare and file all required federal, state and local tax returns and reports in a manner that is consistent therewith.

(Defs.' Ex. M. at D00478-49; Defs.' Ex. V at D00498-99.)

The Operations Transfer Agreements also outlined the allocation of revenues and

expenses among the Operator and New Operator:

6. <u>Revenues and Expenses</u>. All revenues . . . and expenses related to the operation of the Facility shall be prorated as of the Commencement Date, with Operator entitled to such revenues and responsible for such expenses (including, without limitation, the payment of all accounts payable) arising out of its operation of the Faculty for periods prior to the Commencement Date, and New

---

[8] Pursuant to Schedule 2.2(B), excluded assets include: (1) Accounts receivable accrued prior to the Commencement Date; (2) Cash in banks and cash equivalents (other than resident trust funds) of Operator; (3) Personal property and effects of Operator's employees (any such items with a value in excess of $250.00 shall be set forth on a schedule provided to New Operator on or before the Commencement Date); (4) Tax refunds, advance deposits and other prepayments relating to periods prior the Commencement Date; and (5) All security and other deposits under the Lease, to the extent not retained by Lessor in consideration of unpaid rent or other charges.

Operator shall be entitled to the revenues and responsible for the expenses (including, without limitation, the payment of all accounts payable) arising out of its operation of the Facility on or after the Commencement Date.

(Defs.' Ex. M at D00481-82; Defs.' Ex. V at D00501.)

Furthermore, the Operations Transfer Agreements explicitly provided for the assumption of liabilities:

13.   <u>No Assumption of Liabilities</u>. . . . Other than as specifically set forth herein, New Operator shall not assume and shall not be liable for any debts, liabilities or obligations of the Operator including, but not limited to, any (a) liabilities or obligations of the Operator to its creditors, shareholders or owners, (b) liabilities or obligations of the Operator with respect to any acts, events or transactions occurring prior to, on or after the Commencement Date, . . . or (d) any contingent liabilities or obligations of the Operator, whether known or unknown by the Operator or New Operator. . . . Except as specifically provided in this Transfer Agreement, New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Commencement Date, including, but not limited to, any matters relating to cost reports, collections, audits, hearing, or legal action arising therefrom . . .

(<u>Id.</u> at D00484-85; D00504-505.)

**D.  Lock Box Accounts**

On March 29, 2010, Aviv recorded UCC financing statements perfecting its security interests in Brighten at Bryn Mawr and Brighten at Ambler.   Consistent and contemporaneously with the above agreements related to the joint plan of reorganization, particularly the Credit and Security Agreement, Brighten established "lockbox" bank accounts that it owned, and into which its payments from private pay (i.e., non-government) healthcare insurers would be deposited. Brighten established similar accounts to receive government healthcare (i.e., Medicare and Medicaid) payments.   A third-party accounts receivable servicer, Gemino Healthcare Finance,

managed the lockbox accounts.    Per the loan and credit agreements with Aviv, the balance of

Brighten's receipts in the lockbox accounts would affect Brighten's ability to draw on the line of

credit provided by Aviv, and the funds in the lockbox accounts could pay down the line of credit

that Aviv provided.    Brighten utilized the line of credit that Aviv provided to pay its vendors

and other liabilities.

**E.  Business Relationship between Tender Touch and Brighten**

Plaintiff is a provider of speech, language, occupational, and physical therapy services.

On August 1, 2010, Plaintiff entered into Therapy Services Agreements with Brighten at Bryn

Mawr and Brighten at Ambler.    The Agreements required payment sixty (60) days from the

invoice date.    Before entering into the Therapy Services Agreements with Brighten and

providing therapy services for Brighten at the nursing homes, Plaintiff did not perform public

records searches regarding Brighten, did not inquire about Brighten within the professional

community, did not require a credit application from Brighten, and did not perform any research

of Brighten's creditworthiness.    Tender Touch submitted its invoices to Brighten at Bryn Mawr

and Brighten at Ambler.    The invoices indicated the months during which Plaintiff provided the

service corresponding with the invoices.

**F.  Brighten's Default and Management Agreement between Brighten and Saber**

On February 12, 2011, Craig M. Bernfield, Chairman CEO and President of Aviv REIT,

Inc., sent an email to, among others, George Repchick, Saber's co-owner, confirming that Saber

was "authorized to immediately begin operating and take control of the properties and

operations."    (Pl.'s Ex. F, Feb. 12, 2011 email.)    On February 16, 2011, Aviv declared default

against Brighten under the Master Lease (as amended), the Promissory Note, the Term Loan

Note, the Revolving Loan Note, the Security Agreement, the Credit Agreement, and the related

March 26, 2010 agreements.[9]   At the time that Aviv declared default, Brighten's debt to Aviv was in the millions of dollars.

Effective March 1, 2011, Brighten entered into a Management Agreement with Saber Management, Inc. ("Saber Management").   Aviv consented to the Agreement, as memorialized in Section 8.10 of the Agreement.   (Defs.' Ex. R, Management Agreement, at D01995.) Pursuant to the Management Agreement, Saber Management would assume managerial responsibilities for the Bryn Mawr and Ambler nursing home facilities operated by Brighten. Unless earlier terminated, the Agreement term would expire on the date that Saber Management obtained, among other things, a license for the operation of both facilities.   (Id. at D01989.). The Agreement explicitly provided that Saber Management "shall not, by entering into and performing this Agreement, assume or become liable for any of the existing or future obligations, liabilities, or debts of [Brighten] . . . or the Facilities prior to the Effective Date of this Agreement."   (Id. at D01988.)   Saber Management was also given the "exclusive right and power to manage the Facilities" in its business judgment, including the authority to, *inter alia*,: (1) "[e]xpand, contract or otherwise adjust the operations and assets of the Facilities"; and (2) "[n]egotiate, execute or otherwise enter into, adjust, compromise or otherwise deal with, vendors, contracts, agreements and documents relating to the Facilities."   (Id. at D01991.) Brighten had the duty and obligation under the Agreement to: (1) "[n]ot take any action which would jeopardize the Facilities' licenses or interfere with [Saber Management's] . . . operations at the Facilities or be inconsistent with [Brighten's] . . . obligations under this Agreement."; (2) "[t]ake any and all such operations as may be necessary to grant [Saber Management] . . .

---

[9] Default was declared due to, *inter alia*, Brighten's failure to remit the following payments to Aviv in a timely fashion: (1) ground lease payment of $3,899; (2) rent of $292,171.86; (3) RE tax escrow of $28,804.31; and (4) working capital interest of $47,556.41.   (Pl.'s Ex. I, Default Letter from Michael G. Menkowitz.)

exclusive control over all bank accounts of [Brighten] . . . but not including accounts into which proceeds of accounts receivable" and revenues are made to Brighten for any period prior to the Agreement's Effective Date; and (3) "[t]o pay and be responsible for any and all expenses incurred prior to the Effective Date in the operation of the Facilities, including . . . third party vendor contracts."   (Id. at D01993.)   Saber Management thereafter formed Bryn Mawr Healthcare Group, LLC and Ambler Healthcare Group, LLC, apparently to serve as the operating entities that would officially operate the Bryn Mawr and Ambler facilities once the necessary licenses were obtained from the state.

## G.  Assignment and Assumption Agreement

Effective on March 1, 2011, the same day as the Management Agreement, Aviv and Saber entities including Ambler Health, LLC and Bryn Mawr, LLC, ( as "New Lessees") entered into an Assignment and Assumption Agreement.   (Pl.'s Ex. M, Assignment and Assumption Agreement.)   Pursuant to the Agreement, Aviv, as "the owner of the real property and certain personal property" of the Brighten facilities, assigned all its right, title and interest in, to and under the Operations Transfer Agreements, the Power of Attorney, and the Consent to Transfer Licensed Nursing Home Facility to, *inter alia*, Ambler HealthCare Group, LLC and Bryn Mawr Healthcare Group, LLC.   Specifically, the Agreement provided that:

> E.      In connection with obtaining the Approvals and the transfer to the New Lessees by the Operators of certain property that constitutes the Leased Property, [10] Aviv wishes to assign to the New Lessees, and the New Lessees wish to assume from Aviv, all of Aviv's right, title and interest in and to the Transfer Agreements . . . that relate to the Facilitiy of which the New Lessee shall, upon receipt of its respective Approvals, become the new licensed operator.

---

[10]  Under the Agreement, Ambler Senior Services and Chateau Senior Services, as well as other Brighten entities, were designated as the "Operators."

(Id. at D02661.)

**H.  Saber's Alleged Management Period**

      The parties dispute Saber's role vis-à-vis Brighten during Saber's alleged management period.   William Weisberg, Saber's co-owner, testified that, as manager, Saber "functioned one hundred percent entirely on what [Brighten] . . . had in place," and tried to rehire a vast majority of the staff once Saber transitioned to operator.   (Defs.' Ex. S, 83:13-84:6.)   Although Saber did hire Christine Landenberger, former Brighten CFO, none of the other officers or any directors of any Brighten entity are, or were, officers or directors of any Saber entity.   Weisberg also testified that he was unaware of Saber receiving any compensation during its alleged management period.   (Weisberg Dep. 72:23-73:1.)   Landenberger testified that Saber, during its alleged management period, "would take over everything" regarding operations, and, from the financial standpoint, "directed the flow of how vendors were being paid or who was being paid." (Landenberger Dep. 33:16-34:12.)   James O'Connor, co-owner of Brighten, testified that, in regards to his consulting role and involvement in day-to-day operations under Saber's management, "[t]here is a real simple way to say it, there was no role, not wanted, go away, leave as quickly as you can."   (O'Connor Dep. 75:10-12.)   O'Connor also testified that, after February 28, 2011, he "had no interest operationally or financially" in the company.   (Id. at 80:4-7.)

      The process through which account funds were taken in and distributed during Saber's alleged management period is somewhat intricate.   Defendants assert that, as manager, Saber received Brighten's recommendations regarding which of Brighten's vendors provided critical services such that their outstanding invoices should be given priority for payment.   Specifically, Weisberg stated that Saber would receive the recommendations of Landenberger regarding

which of Brighten's vendors "needed to be paid."   (Weisberg Dep. 85:21-23.)   He continued

that he would take this information, "look at it and try to factor into priority basis," and then

would provide this information to Aviv's representatives "since they ultimately controlled the

lockbox accounts."   (Id. at 85:25-86:4.)   Weisberg also testified that although "it is fair to say"

that he was one of the last people discussing payables, "[he] and Christine were both the voices"

presenting requests to Aviv.   (Id. at 89:11-18.)   Saber would then allegedly review and revise

the list of vendors, and submit it to Aviv for final approval of the draw on the Brighten line of

credit necessary to fund disbursements.   Landenberger also expounded upon this alleged

payment process in her testimony:

> Pretty much what had changed in the process from paying any vendor from that
> standpoint was anything that was going to be paid had to be run by Mr. Weisberg
> first.   So there was -- there was an approval process that myself and Emily
> Brennan, who I said was the cash management, would put together a request list,
> if you will, for lack of a better word, as far as the vendors that were calling what
> had been identified as, you know, problems as far as if they're not going to supply
> or what have you.   We would send it over to Mr. Weisberg, who . . . went
> through the listing, and if they had any questions as far as who was getting paid or
> who wasn't getting paid or they just looked at everything and wanted to make a
> decision as far as if they were going to get paid or not.
>
> After that we would . . . have to send over a template that was broken down by
> each facility.   It said the vendor, it said the amount and it said the service dates
> in it.   It would then go over to Mr. Weisberg, who would review it, give us his
> okay.   At that point in time we would initiate that borrowing base certificate that
> we said that we forwarded over to Josh Kochek at Aviv, along with the file that
> had all -- had identified all of the individual vendors as well as payroll, and then it
> would be noted that Bill authorized or had already reviewed and approved the
> amounts.   And then Josh would go ahead and either -- if he had any further
> questions, he may ask.   If he didn't, then the funds would just go ahead and be
> released into the Brighten accounts of which then the monies were released to the
> vendors identified on that sheet.

(Landenberger Dep. 34:24-36:21.)   Landenberger continued that she believed the next step after

approval was that an email would be sent to Gemino authorizing the release of the funds into the

Brighten Health Group account, and then the funds would be moved internally into the individual accounts for each facility.   (Id. at 38:7-22.)

The relationship between Saber and Brighten during the purported management period, including Saber's alleged assumption of Brighten's liabilities, is further discussed *infra*.

## I.  Payment to Tender Touch

The parties dispute the amount due and owing to Plaintiff.   It is undisputed that Brighten did not have sufficient funds to pay all of its vendors.   Defendants allege that, despite the 60-day payment provision in its services contract, and the commencement of service in August, 2010, Plaintiff had never received a payment from Brighten prior to Saber's management period in March 2011.   However, Plaintiff's Customer Balance Detail, which Defendants list as an exhibit to their motion, allegedly shows that Tender Touch received two payments on or about February 28, 2011 in the amounts of $36,921.59 and $71,235.01.   (Defs.' Ex. T.)   According to the Customer Balance Detail, Tender Touch also received two payments on or about March 25, 2011 in the amounts of $54,346.03 and $49,085.42 for services rendered.   The issue of Plaintiff's payment for its provision of services, and more specifically, whether Saber ostensibly assumed this debt, is further discussed *infra*.

In the current action, Tender Touch seeks to collect $250,763.57 for services allegedly provided to Brighten at Ambler from August 1, 2010 to March 31, 2011, and $418,215.31 for services allegedly provided to Brighten at Bryn Mawr for this same period.   Overall, Tender Touch allegedly provided $553,942.00 in services to Brighten, of the $668,978.00 it claims is due and owing, in the period of August 1, 2010 to February 28, 2011; it also allegedly billed $115,036.88 for services provided to both facilities in March 2011.   (See Defs.' Ex. T.)

14

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A "genuine" issue exists where there is a "sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party."   <u>Byrne v. Chester County Hosp.</u>, Civ. A. No. 09-889, 2012 WL 410886, at *2 (E.D. Pa. Sept. 19, 2012) (citing <u>Kaucher v. Cnty. Of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006)).   "A factual dispute is 'material' if it might affect the outcome of the case under governing law."   <u>Id.</u>   All factual doubts should be resolved, and all reasonable inferences drawn, in favor of the nonmoving party.   <u>Torretti v. Main Line Hospitals, Inc.</u>, 580 F.3d 168, 172 (3d Cir. 2009) (citing <u>DL Res., Inc. v. FirstEnergy Solutions Corp.</u>, 506 F.3d 209, 216 (3d Cir. 2007)).   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247, 253 (3d Cir. 2007) (quoting <u>Anderson</u>, 477 U.S. 252 at 250).   The movant is responsible for "informing the court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact."   <u>Byrne</u>, 2012 WL 410886 at *2 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).


## III.   <u>DISCUSSION</u>

In their Motion for Summary Judgment, Defendants argue that Plaintiff's successor liability claims cannot withstand summary judgment for the reason that Saber is not a

15

"successor" of Brighten because: (1) the 2011 transactions were not mergers or asset transfers, and (2) there is no overlapping ownership or corporate hierarchy between Saber and Brighten. In response, Plaintiff avers that there is a genuine issue of material fact as to these causes of action because: (1) Saber implicitly assumed the liabilities of Brighten, and (2) adequate consideration was not provided to Brighten, and there were no provisions made for Brighten's creditors.

Defendants also aver that Plaintiff's civil conspiracy claim is meritless because: (1) Aviv and Saber acted lawfully and properly; (2) there is no underlying tort; and (3) this claim is incompatible with successor liability theory.   Plaintiff responds by stating that, not only is there an underlying tort, but Defendants also violated applicable statutes governing the operation and management of long-term nursing facilities.

This Court will take these arguments in turn.

## A.  Successor Liability

Under Pennsylvania law, "it is well-established that 'when one company sells or **transfers all of its assets** to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property." Cont'l Ins. Co. v. Schneider, Inc., 582 Pa. 591, 599, 873 A.2d 1286 (2005) (emphasis added) (quoting Hill v. Trailmobile, Inc., 412 Pa. Super. 320, 324, 603 A.2d 602, 605 (1992).[11]

As a preliminary matter, Defendants argue that Plaintiff cannot establish that Brighten sold

---

[11] This rule also applies in cases where a corporation has acquired "substantially all" the assets of another corporation.   See, e.g., Dawejko v. Jorgensen Steel Co., 290 Pa. Super. 15, 434 A.2d 106 (1981).

or transferred all or substantially all of its assets to Saber, and therefore Plaintiff's successor liability claims are "non-starters."   They contend that there was no transferring transaction between Saber and Brighten at all because: (1) Aviv contracted with Brighten in March 2010 to lease the facilities to Brighten, and to loan Brighten funds on terms that included Aviv's right to remove Brighten in the event of default; (2) Brighten defaulted in February 2011; (3) Aviv thereafter terminated Brighten's lease; and (4) Brighten and Saber entered into a Management Agreement, with Aviv's consent, wherein Saber would manage the nursing facilities beginning around March 1, 2011, until it could obtain the appropriate licensing to replace Brighten as operator.   Following this timeline, Defendants contend that no assets "passed hands" between Brighten and Saber.   Defendants also aver that Aviv had the perfected first-position security interest in Brighten's assets, and therefore Brighten did not have the authority to transfer assets on its own.   Last, Defendants contend there was no transfer of assets between Brighten and Saber because Aviv was the owner of the real estate, buildings, and equipment at the Brighten facilities, and had merely leased these assets to Brighten under the Master Lease.   In its cursory response to this argument, Plaintiff cites to <u>Schneider</u> for the proposition that "[a] company's purchase or receipt of assets in a foreclosure sale or transaction does not bar an unsecured creditor from asserting a successor liability claim against the receiving company."   (Resp. to Mot. for Summ. J. 13) (citing <u>Schneider</u>, 582 Pa. at 599-600).

The 2010 Operations Transfer Agreements between the Brighten facilities and Aviv provided that, in the event of default, Brighten would "deliver, convey, and **transfer**" to Aviv: (1) all assumed contracts and leases; (2) all intangible property; (3) the rights of Brighten under any provider agreements with Medicare, Medicaid, or any other commercial third party payor programs; (4) all documents, charts, personnel records, property manuals, resident records and

17

lists of the books, files and other business records attributable to the business or operations of the facility; (5) the name of the business and all telephone numbers, email addresses, websites, and other related items; (6) all resident trust funds; and (7) all other real and personal property or other intangible assets used or maintained in connection with the operation of the facilities.   (Defs.' Exs. M and V) (emphasis added).   On March 1, 2011, the very same day that the Management Agreement between Brighten and Saber became effective, the Assignment and Assumption Agreement between Aviv and Saber also became effective.   Under the Assignment and Assumption Agreement, Aviv assigned to Saber all of its "**right, title and interest in, to and under** the Operations Transfer Agreement, the Power of Attorney and the Consent to Transfer Licensed Nursing Home Facility" as to both Brighten at Ambler and Brighten at Bryn Mawr. (Pl.'s Ex. M) (emphasis added).   In addition, the following language is featured in the Assignment Agreement:

> In connection with obtaining the Approvals and **the transfer to the New Lessees** [Saber] **by the Operators** [Brighten] **of certain property that constitutes the Leased Property**, Aviv wishes to assign to the New Lessees, and the New Lessees wish to assume from Aviv, all of Aviv's right, title and interest in and to the Transfer Agreements.

(Id.) (emphasis added).

The record thus demonstrates that there appears to have been a transfer of assets from Brighten to Saber based on Defendants' contractual agreement.   When Aviv declared default in February 2011, Brighten ostensibly transferred the above-listed assets to Aviv pursuant to the Operations Transfer Agreements.   Although some assets were excluded from this transfer, including accounts receivable accrued prior to the Commencement Date, it is reasonable to conclude that the assets transferred to Aviv under the Operations Transfer Agreements constituted substantially all of Brighten's assets.   (See Defs.' Ex. V, Schedule 2.2(B) at D00511.)

18

Thereafter, Aviv subsequently transferred all rights it had under the Operations Transfer Agreements to Saber on March 1, 2011, pursuant to the Assignment and Assumption Agreement. Defendants argue that this chain of events demonstrates that Brighten transferred assets to Aviv, who thereafter transferred its rights to these assets to Saber; therefore, no transfer would have actually occurred between Brighten and Saber.   However, the contractual language in the Assignment and Assumption Agreement, entered into by Defendants Saber and Aviv, clearly references the transfer to the New Lessees (Saber) **by** the Operators (Brighten) of the leased property (defined as the real property and certain personal property used in operation of the Brighten facilities).   (Pl.'s Ex. M.)   Thus, by the terms of Defendants' own contract, Brighten does appear to directly transfer assets to Saber.   Therefore, because the contract entered into by Defendants clearly acknowledges some form of transfer of assets between Brighten and Saber, this Court will proceed in its analysis.[12]

### 1. *Non-Liability Exceptions*

The Defendants next contend that, even if there was a transfer of assets between Brighten and Saber, Plaintiff's successor liability claims must fail because Saber is not a "mere continuation" or *de facto* merger successor of Brighten.   The Supreme Court of Pennsylvania has recognized five exceptions to the general rule of successor non-liability: (1) where the purchaser of assets expressly or implicitly agrees to assume the liabilities of the transferor; (2) where the transaction amounts to a consolidation or merger ("*de facto* merger"); (3) where the purchasing corporation is merely a continuation of the transferor corporation; (4) where the transaction is fraudulently intended to escape liability; and (5) where the transfer was without adequate

---

[12]   Despite Plaintiff's reliance on <u>Schneider</u>, the Court finds that case inapplicable.   <u>Schneider</u> concerned an unsecured creditor's assertion of a successor liability claim against an entity that had purchased the debtor's assets in a **UCC section 9-504 foreclosure sale;** this analysis is therefore distinguishable from the instant matter.

consideration and no provisions were made for creditors of the selling corporation.    Schneider,

873 A.2d at 1286 (citing Hill, 603 A.2d at 605); see also Aluminum Co. of America v. Beazer East,

Inc., 124 F.3d 551, 565 (3d. Cir 1997) (citing Philadelphia Electric Co. v. Hercules, Inc., 762 F.2d

303, 308 (3d Cir. 1985)). [13]

Surprisingly, Defendants contend in their motion that "mere continuation" and *de facto*

merger are the two exceptions to the general rule of non-liability that Plaintiff relies on in this case.

However, this assertion is clearly inapposite to the pleadings in this matter.    In its Complaint,

Plaintiff alleges that Defendants Saber, Saber Holdings, Bryn Mawr Healthcare, and Ambler

Healthcare: (1) "expressly and/or impliedly agreed" to assume Brighten's debts; (2) the 2011

transactions between Brighten and Saber amounted to an "acquisition, consolidation or merger

between the sellers and purchasers"; (3) Defendants are "merely a continuation" of Brighten; and

(4) that there was an "absence of adequate consideration for the sale and/or transfer" between

Brighten and Saber.    (Compl. at ¶¶ 92-96; 99-103.)    It is therefore peculiar that Defendants only

discuss **two** of the successor liability exceptions in their Motion for Summary Judgment.    Even

more odd is that, in its response to the Motion for Summary Judgment, Plaintiff does not respond

directly to the exceptions addressed by Defendants, but rather argues that Saber implicitly

assumed the liabilities of Brighten, and that adequate consideration was not provided to Brighten

and there were no provisions for its creditors.    Faced with this dilemma, this Court will address

whether summary judgment should be granted as relates to the following three arguments: (1)

---

[13]  Both this Court, in its March 23, 2012 Opinion (Doc. 18), and Defendants, in their Motion for Summary
Judgment, refer to the four exceptions to the general rule of non-liability provided for in Aluminum Co. of America
v. Bezer East, Inc., 124 F.3d 55, 1565 (3d Cir. 1997) (citing Philadelphia Electric Co. v. Hercules, Inc., 762 F.2d
303, 308 (3d Cir. 1985)).    Plaintiff, on the other hand, refers to the five exceptions provided for under Cont'l Ins.
Co. v. Schneider, Inc., 582 Pa. 591, 599-600 (2005).    These two standards are both sound jurisprudence, but the
latter identifies an additional exception where a transfer was without adequate consideration, and no provisions were
made for creditors of the selling corporation.    This Court will consider all exceptions discussed by parties in its
analysis.

whether Saber is a "mere continuation" of Brighten, and whether the transaction between the entities amounted to a *de facto* merger (the third and second exceptions); (2) whether Saber implicitly assumed the liabilities of Brighten (the first exception); and (3) whether adequate consideration was provided to Brighten (the fifth exception).

### a. *De facto* merger/ "mere continuation"

Defendants argue that Plaintiff relies on the *de facto* merger and "mere continuation" exceptions to the general rule of non-liability.   The "mere continuation" exception analyzes whether the asset transfer results in the corporation merely changing its form and ceasing to exist as a legal entity upon the creation of the successor corporation.   In re Asousa P'ship, 01-12295DWS, 2006 WL 1997426, at *8 (Bankr. E.D. Pa. June 15, 2006) (citing   Cont'l Ins. Co. v. Schneider, Inc., 2002 PA Super 323, 810 A.2d 127, 134 (Pa. Super. Ct. 2002) aff'd, 582 Pa. 591, 873 A.2d 1286 (2005) ("Schneider II")).   "The major elements of this exception are identity of the officers, directors, or shareholders, and the existence of a single corporation following the transfer." Schneider II, 810 A.2d at 134-35.   The *de facto* merger exception identifies four comparable factors: "(1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation."   Id. (citing Commonwealth v. Lavelle, 555 A.2d 218, 228 (Pa.Super. 1989)); see also Berg Chilling, 435 F.3d at 468–69. "Though each of these factors is considered, they do not all have to be present. Rather, the factors are merely indicia of a de facto merger."   In re Asousa P'Ship, 2006 WL 1997426, at *8. "A *de facto* merger 'will always be subject to the fact-specific nature of the particular underlying corporate realities and will not always be evident from the formalities of

21

the proximal corporate transaction.'"   Lehman Bros. Holdings, Inc. v. Gateway Funding

Diversified Mortgage Servs., L.P., CIV.A. 11-6089, 2013 WL 6667733, at *15 (E.D. Pa. Dec. 17,

2013) (quoting Fizzano Bros. Concrete Products, Inc. v. XLN, Inc., 615 Pa. 242, 273, 42 A.3d 951,

969 (2012)).   The "elements of the *de facto* merger are not a mechanically-applied checklist, but

a map to guide a reviewing court to a determination that, under the facts established, for all

intents and purposes, a merger has or has not occurred between two or more corporations,

although not accomplished under the statutory procedure."   Id.

Courts have generally treated the mere continuation and de facto merger exceptions

identically; this Court will do the same.   See In re Asousa Partnership, 2006 WL 1997426, at *8

(Bankr.E.D.Pa.2006) *(*citing Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 464 (3d

Cir.2006)); see also Fiber–Lite Corporation v. Molded Acoustical Products of Easton, Inc., 186

B.R. 603 (E.D.Pa.1994)*,* affirmed mem., 66 F.3d 310 (3rd Cir.1995) (noting that the continuity

exception has functionally been subsumed by the *de facto* merger exception).   Due to the

similar nature of the two exceptions, this Court will only consider the de facto merger factors.

See In re Asousa Partnership, 2006 WL 1997426, at *8 ("Given the identical application of the

two doctrines, I will address only the de facto merger factors.").

(1) Continuity of Ownership

The continuity of ownership factor of the de facto merger exception is "often stated as

requiring 'a continuity of shareholders which results from the purchasing corporation paying for

the acquired assets with shares of its own stock, this stock ultimately coming to be held by the

shareholders of the seller corporation so that they become a constituent part of the purchasing

corporation."   Lehman Bros., 2013 WL 6667733 at *17 (quoting Fizzano Bros. Concrete

Products, Inc. v. XLN, Inc., 615 Pa. 242, 251, 42 A.3d 951, 956 (2012)).   The Pennsylvania

Supreme Court has held that this factor is **mandatory**, and that "the de facto merger exception **requires** 'some sort of' proof of continuity of ownership or stockholder interest." Id. (citing Fizzano, 42 A.3d at 969) (emphasis added).

It is undisputed by the parties that none of the owners, members, or shareholders of any Saber entity are owners, members, or shareholders of any Brighten entity.   Although it is true that Saber hired Brighten's former Chief Financial Officer, Christine Landenberger, none of the other officers or any directors of any Brighten entity are or were officers or directors of any Saber entity. Id.   Based on this record, this Court holds that there is no genuine issue of material fact as to continuity of ownership between Brighten and Saber; there was none.   The only connection between the two entities under this factor is the continued employment of Christine Landenberger, who testified that she was unsure if she even had an official title at Saber.   (Landenberger Dep. 8:11-21.)   Because this factor is mandatory under the *de facto* merger/ "mere continuation" analysis, this Court need not proceed to consideration of the other *de facto* merger/ "mere continuation" factors.   The de facto merger or mere continuation exceptions are not applicable to the instant case.[14]

### b.  Implicit agreement to assume Brighten's debts exception

In its Response, Plaintiff avers that Saber implicitly assumed the liabilities of Brighten, and therefore successor liability should attach.   In determining whether a successor corporation implicitly assumed an obligation of its predecessor, Pennsylvania courts have found the following factors relevant: (1) "whether the successor's conduct indicated its intention to assume the debt"; (2) "whether the creditor relied on the conduct and the effect of any reliance"; and (3) "whether the successor's representatives admitted liability."   Bird Hill Farms, Inc. v. U.S. Cargo & Courier

---

[14]  Plaintiff appears to concede this point by its failure to reply to this argument in its Response.

Serv., Inc., 2004 PA Super 66, 845 A.2d 900, 905 (Pa. Super. Ct. 2004).   This Court will consider

each of these factors in turn.

(1) <u>Successor's conduct indicated intention to assume debt</u>

First, Plaintiff contends that Saber implicitly agreed to assume Brighten's debt because

Saber, with Aviv's consent, paid Plaintiff's past due invoices for August and September 2010

during the transition period; these invoices were allegedly for Plaintiff's services rendered in the

months preceding Saber's involvement with the facilities.   According to Tender Touch's

Customer Balance Detail, payments were allegedly made to Plaintiff relating to Brighten at

Ambler and Brighten at Bryn Mawr on February 28, 2011 and March 25, 2011.   (<u>See</u> Defs.' Ex.

T.)   Defendants aver that Saber recommended, and Aviv approved, these partial payments from

Brighten's accounts towards Plaintiff's arrearage, but that any payments to Plaintiff came "from

Brighten funds, in Brighten bank accounts, via Brighten checks, in an effort to keep Tender Touch

from pulling out of the facilities while Saber worked to negotiate an agreement for services on a

going-forward basis."   (Defs.' Reply 4.)   They allege that this was done in exchange for

Plaintiff's indication to Saber that it was interested in contracting with Saber on a going forward

basis, and that it would not cease providing services if it could enter into such a relationship.

On February 28, 2011, Landenberger sent Weisberg an email in which she stated that she

"informed Tendretouch [sic] that we could authorize one month of payment at this time," that she

"didn't go into any specifics about any future payments," and that she believed that the payment

"should hold him."   (Pl.'s Ex. K.)   On March 23, 2011, Weisberg sent Landenberger an email

asserting, "I think we will need to get them a month payment to continue to work with us and to

contract with me going forward.   I threw them our contract as an olive branch as they know after

this one month of payment, they may not get another dime."   (Pl.'s Ex. L.)   In his deposition,

24

Weisberg testified that a conversation occurred between him and Moses Schwartz, Tender

Touch's CEO, in which Schwartz agreed to work on the pre-February 28, 2011 outstanding

Brighten balances, and Weisberg informed him that Saber would provide Tender Touch with a

"payment in good faith to try to continue to work with" it for the time Saber was in place as

manager.  (Weisberg Dep. 147:10-148:10.)   Weisberg testified that he tried to make clear to

Schwartz that he could get him a payment "for the time I'm here managing the cash," and would

"work to get [him] . . . a payment because [he] . . . [was] a critical vendor, but [Weisberg could not]

. . . speak to or help right at this point because it was such a big mess prior to February 28th."   (Id.

at 148:5-10.)   Specifically, Weisberg testified that he explicitly told Schwartz that, in terms of

payments, he could work with him "moving forward" but could not make any guarantees as to any

past outstanding payments.  (Id. at 169:2-9.)   Weisberg continued that after he made the payment

to Tender Touch, Schwartz "did a 360 . . . and started threats."  (Id. 147:16-21.)   According to

Weisberg, Schwartz then began threatening him with "hostage holdings of pay me more and pay

me the old or else," and Tender Touch subsequently pulled out of the facilities.  (Id. at 147:16-21;

149:2-4.)   Weisberg also testified that "[v]ery clearly I can tell you Saber never paid down

Brighten liability," and that "at any chance we were given, we made it clear that Saber was never

paying any Brighten liability.  So no, I can definitively say that was never the case."  (Id. at

122:17-123:7.)   O' Connor also testified in his deposition that it was his understanding that

preexisting payables that were already owed "were the obligation of Brighten Health Group.

Saber didn't assume any debts, they assumed management."  (O'Connor Dep. 80:18-25.)

 Plaintiff disputes, however, that Tender Touch would continue to render services at the

facilities without payment in full of its outstanding invoices.   Schwartz affirmed in his testimony

that he did have conversations with Weisberg, and that Saber sent him the two March 25, 2011

payments.   (Schwartz Dep. 56:4-7.)   During his deposition, Schwartz also testified as follows:

> Q. Now, Tender Touch was hoping to get the entirety of the Brighten balance paid, right?
> A. We were hoping that our relationship would continue and we will be -- we didn't expect to get paid everything at one time.   We expect we were continuing to provide services, and just like we were getting paid, we will continue to get paid.
> Q. You thought --
> A. I thought that I was lucky that there's a new person who I can talk to.   It's not Christine or people who are there.   And I will continue to provide services and get paid for my services, and slowly but surely they'll catch up.
> Q. You were hoping that Mr. Weisberg or whatever Mr. Weisberg's entity is would get Tender Touch paid for the old invoices going back to services in August of 2010?
> A. Correct.   Let me clarify.   I hope Mr. Weisberg and his entity will continue everything what we had before.
> Q. By that, you mean Tender Touch would continue to provide service - -
> A. Provide services and get paid for the old receivables, and everything would continue as before.
> . . .
> Q. Mr. Weisberg, in response to your request, Mr. Weisberg told you something to the effect that he could get you some payment for some of the accrued bills, correct?
> A. I don't recall.   I can only give you the understanding what we had.   I cannot recall specifically his words or what.   I can only tell you my understanding was that our relationship will continue and I'll be paid for my prior services.
> Q. Who told you that?
> A. That was my understanding from the conversations.
> Q. Did Mr. Weisberg actually tell you that?
> A. I don't recall. I cannot recall.

(Id. at 56:8-59.6.)

Schwartz continued that he only decided to discontinue provision of services after receiving an email from Weisberg on March 29, 2011, in which Weisberg allegedly stated "No, I cannot help you get payment for old invoices."   (Id. at 54:9-14; 60:10-61:8.)

This Court holds that there is a genuine issue of material fact as to whether Saber's conduct in relation to the February and March 2011 payments indicated its intent to assume Brighten's debt.   A reasonable jury could conclude one of two things: either these payments indicate Saber's

intention of assuming responsibility for the entire past due balance, or the payments were made in good will, in the hopes that Plaintiff would continue a business relationship with Saber.   Schwartz in fact testified that he believed that these payments towards the outstanding debt would continue to be paid off, and that Tender Touch only terminated its provision of services once it received Weisberg's email on March 29, 2011, four days **after** the last payments, stating that no payment would be forthcoming on old invoices.   Therefore, factual issues remain on this point.

Second, Plaintiff also alleges that Saber collected on Brighten's accounts receivables for services rendered by Brighten prior to the transition period, and utilized these receivables to continue the uninterrupted operations of the Brighten facilities pending the approval of its license, including making payments to critical vendors.   Through these actions, according to Plaintiff, Saber's conduct indicated its intention to assume Brighten's debt.   Defendants counter that, with Saber as manager, the billing and collection activities continued much as they did before March 1, 2011.   According to Defendants, Saber managed operations under Brighten's license, but Brighten still billed Medicare, Medicaid and private insurers for healthcare services rendered, payments still deposited into the lockbox accounts, and payments would be made from Brighten's accounts to Brighten's vendors.   Defendants also aver that Sections 1.1[15] and 5.3(e)[16] of the Management Agreement explicitly state that Saber does not assume any of Brighten's liabilities incurred prior to March 1, 2011, and that Brighten would retain such liabilities. Furthermore, Defendants argue that there has been no explicit verbal or written agreement that

---

[15]  "Manager shall not, by entering into and performing this Agreement, assume or become liable for any of the existing or future obligations, liabilities, or debts of Operator or the Facilities prior to the Effective Date of this Agreement."   (Defs.' Ex. R, D01988.)

[16]  The operator shall have the duty and obligation to "pay and be responsible for any and all expenses incurred prior to the Effective Date in the operation of the Facilities, including, without limitation, payroll, insurance, utilities, any amounts due and payable under the Lease, equipment leases, and third party vendor contracts, taxes, and maintenance obligations."   (Id. at D01993.)

27

Saber would assume any of Brighten's liabilities.

This Court agrees with Defendants that, under the **terms** of the Management Agreement between Brighten and Saber, Saber is not responsible for any expenses incurred prior to March 1, 2011, including third party vendor contracts; Saber also is more generally exempted from assuming any of the existing or future obligations, liabilities, or debts of Brighten prior to this date. (See Defs.' Ex. R, at D01988, D01993.)   However, there are genuine factual questions as to whether Saber actually abided by the terms of the Management Agreement.   Under the Management Agreement, Brighten has the duty and obligation:

> (e) To pay and be responsible for any and all expenses incurred **prior to the Effective Date** in the operation of the Facilities, including, without limitation . . . third party vendor contracts.

(Id. at D01993) (emphasis added).   In addition, the Management Agreement gives Saber the duty and obligation to "collect revenues which relate to services rendered in the operation of the Facilities **after** the commencement of this Agreement," while **Brighten** was vested with the duties and obligations to:

> (c) Take any and all such actions as may be necessary to grant Manager exclusive control over all bank accounts of Operator, including but not limited to payroll and operating account . . . **(but not including accounts into which proceeds of accounts receivable, revenues or third party reimbursement payments are made to Operator for any period prior to the Effective Date of this Agreement).**

(Def. Ex. R, D01993.) (emphasis added).   Therefore, by the terms of the Management Agreement, Saber's management control did not extend to any bank accounts containing Brighten's pre-March 1, 2011 accounts receivable proceeds and revenues, which instead, ostensibly, remained under Brighten's purview.

Record evidence before this Court, however, illustrates that there is a genuine issue of

material fact as to whether, in spite of the contract's non-liability provisions and the provisions that outline Brighten's apparent control over accounts containing pre-March 1, 2011 accounts receivable and revenue (which ostensibly would include funds related to Plaintiff's pre-March 1, 2011 provision of services), Saber indicated an intention to assume Brighten's debt by controlling these funds and using them to continue operations.   On June 27, 2011, Joshua Kochek of Aviv sent an email to Weisberg, in which he stated "[a]s the quarter is ending we need to disentangle the Saber and Brighten funds.   If we have advanced Saber more funds than you have taken in, we would effectively be lending you Brighten's money."   (Pl.'s Ex. G, June 27, 2011 email.) He continued, "[i]f there is a gap we are prepared to provide a working capital loan to Saber as we previously discussed."   (Id.)   In response, George Repchick of Saber emailed "Yup, let's call it even.   We don't owe anything and Brighten owes everything."   (Id.)   This email clearly illustrates a factual issue as to the handling of Brighten's funds during Saber's alleged management period.   In light of the complicated accounting scheme during this time period, discussed *supra*, the issue of the potential "entanglement" of Brighten and Saber funds, and to what extent this may have impacted Saber's alleged assumption of Brighten's liabilities, simply cannot be resolved at this stage of the proceedings.

In addition, the September 19, 2011 Reconciliation Schedule, sent as an attachment in an email from Joshua Kochek of Aviv to James O'Connor and other parties, also illuminates the factual issues still at play.   (Pl.'s Ex. A.)   The Reconciliation Schedule is alleged to have been compiled by Aviv from information it obtained from Saber.   (O'Connor Dep. 131:23-132:3; Landenberger Dep. 59:9-60:4.)   This document was allegedly created in order for Aviv and Saber to differentiate between funds that should be credited to Brighten, and funds that should be credited to Saber.   (O'Connor Dep. 135:8-20; 141:8-18.)   The Schedule ostensibly shows that

the amount owed on the Brighten loan as of September 19, 2011 was $1,474,684.89, with the outstanding amount remaining on Brighten's loan at that time (including indemnity) being $2,922,879.89.   (Pl.'s Ex. A.)   On what appears to be the second page of the Schedule, there is a chart with each Brighten facility and the months March-September along one axis, and the following columns along the other axis: "Total," "Before 3/1," "3/1 and After," "Difference after sheet adjustments," and "Withheld."   (See Pl.'s Ex. A, D02590.)   Underneath the "Before 3/1" Column, the total is listed as $5,893,264.35 for all the facilities; this amount is also listed on the first page of the Schedule as "Brighten Cash Collected into Gemino Account."   In her deposition testimony, Christine Landenberger acknowledged that the Reconciliation Schedule showed that by September 19, 2011, Saber had collected nearly $6 million for services that had been provided to Brighten prior to March 1, 2011.   (Landenberger Dep. 95:3-16.)   The first page of the Schedule also lists "Brighten Cash Collected into non-Gemino Account" as $225,177.51, and states an Aviv Loan Repayment in the amount of $2,999,480.41, that critical vendors were paid the amount of $1,713,633.97, and that payroll was paid in the amount of $1,405.327.48.   (Id.)

Initially in his deposition, O'Connor testified that the "Before 3/1" and "3/1 and After" columns in the schedule represent amounts Aviv collected into the Gemino account before and after March 1, 2011, that these dates had nothing to do with dates of service, and that they simply reflected when cash was actually received.   (O'Connor Dep.103:10-107:18.)   Later, O'Connor appeared to concede, however, that "there was little or no focus" on accounting for funds that came in post-March 1, 2011 for services delivered pre-March 1, 2011, testifying that:

> I made a basic assumption that people at Aviv always treated me honorably and when they were going to generate reports, I never had to worry about them being dishonest.   I didn't think Saber was dishonest, so I never hired a forensic accountant to go back and look to make sure that everything that was credited was in fact credited.   I made the basic assumption, I was dealing with honorable

> people, we had a different business approach to things.   You asked me was
> Weisberg was honest, I had no reason to believe he wasn't.   So what they gave me,
> I took it face value as being correct.

(O'Connor Dep. 110:25;11:1; 111:24-112:15.)   O'Connor subsequently testified that in order to

actually understand the numbers on the Reconciliation Schedule, there would need to be greater

detail provided as to the remittance advices, and that, in September 2011, he believes either Saber

or Gemino would have had this information.   (O'Connor Dep. 120:16-121:8.)   O'Connor then

appeared to agree that it looked as if the Schedule's chart draws a distinction along revenues

generated from pre- and post- March 1, 2011 **dates of service**, before stating that he can only

speculate as to dates of service without seeing the remittance advice. (Id. at 121:15-23; 130:4-13.)

Thereafter, O'Connor testified that the "Before 3/1" and "3/1 and After" columns represent the

transition date.   (Id. at 133:12-13.)

In her deposition, Landenberger also spoke to potential issues with the Reconciliation

Schedule, and, by implication, the effect this may have had on Saber's interaction with, and use of,

Brighten's pre-March 1, 2011 accounts receivable and revenues.   Landenberger noted that on or

about August 2011, an issue occurred that resulted in a loss of access to the Brighten server.

(Landenberger Dep. 56:8-20.)   As a result of this incident, a "big, huge issue" arose in regards to

what the balances were prior to losing access to the server, with Landenberger testifying that "it

wasn't planned that we were losing access to the system when we did.   So a lot of the reports were

not current.   So it definitely could have impeded on the ability to go after additional funds if they

weren't already collected." (Id. at 58:11-25.)   Landenberger also referred to a "detailed schedule"

put together by Aviv (ostensibly the Reconciliation Schedule") in her testimony, asserting "I know

that I was aware of it, and I know there were imperfections on it, and there were issues, but I don't

know where that ever went." (Id. at 59:16-60:4.)   Landenberger also "leaned towards yes" in regards to the statement that any imperfections in this schedule tended to work against Brighten's debt position, and favorable to Saber's debt position. (Id. at 60:14-61:11.)   More generally, Landenberger testified that "in the beginning cash that was in the bank . . . prior to March 1 services was used for payroll expenses that were incurred after March 1." (Id. at 48:24-49:8.) She later agreed that in the period from March 1, 2011-July 1, 2011, Brighten was the entity entitled to generated revenue because everything during that time period was still that of the Brighten entities. (Id. at 52:15-53:17.)   According to Landenberger, revenues generated from services through June 30, 2011 were to be accounted for as Brighten revenues, and that these revenues might not be collected until as late as fall 2011. (Id. at 55:10-20.)

The record therefore illustrates genuine issues of material fact also exist as to Saber's management of Brighten's pre-March 1, 2011 accounts receivable and revenue, and whether this conduct indicates its assumption of Brighten's liabilities.   It would be reasonable for a jury to conclude, based on the record, that Saber's conduct in this regard equated to an attempt to assume Brighten's debt.   In fact, it is a far from settled issue how the contractual non-liability provisions would be reconciled with Saber's alleged consumption of Brighten's pre-March 1, 2011 funds in seeming contravention of the same contract.   The lingering inconsistencies revolving around interpretation of the Reconciliation Schedule, as well as the extent to which Saber and pre-March 1, 2011 Brighten funds were intermingled and used, clearly show that there are unresolved genuine issues of material fact remaining on this topic.

(2) Plaintiff's reliance

Plaintiff also argues that it reasonably relied on Defendants' conduct.   It states that it believed Defendants' actions indicated that its remaining outstanding invoices would be paid and,

32

based on that notion, it continued to provide services at the Brighten facilities in March 2011. According to Plaintiff, the effect of this reliance was that it provided an additional $115,036.88 in services in March 2011, a time when Saber had taken over managing, and allegedly operating, the Brighten facilities.   Based on this Court's foregoing analysis under the previous factor, it finds that Plaintiff has sufficiently established that it relied on Defendant's conduct.

### (3) Successor's admission of liability

Plaintiff also alleges that Saber admitted liability for Brighten's debt.   It avers that Defendants have offered no explanation for Saber's August 23, 2011 draw on a promissory note (which was personally guaranteed by the co-owners of Saber) to repay Aviv $2,996.133.48 of the amount outstanding on the Brighten loan.   Defendants counter that the internal memorandum which addressed this draw merely indicated: (1) that Saber took this draw on a working capital loan that Aviv provided to Saber; (2) that Aviv intended, for its own internal accounting purposes, to reduce Brighten's debt by the amount of the Saber loan; and (3) this internal accounting was appropriate to properly credit Brighten's debt to Aviv, because Aviv funded the loan to Saber with the proceeds that Aviv received from Brighten's activities at the skilled nursing facilities.

On July 22, 2011, Saber and Aviv agreed to a promissory note through which Saber agreed to pay back to Aviv the principal sum of up to three million dollars.   (Pl.'s Ex. B, Promissory Note).   On August 23, 2011, Aviv's Kyle Sweeney sent Joshua Kochek and others a memorandum stating:

> Saber is looking to draw on promissory note which has a maximum loan amount of $3,000,000.00.  **The initial draw will be $2,996,133.48 and proceeds will repay $2,996,133.48 of outstanding on current Brighten loan**.
>
> Additionally, any remaining security deposit for Brighten will be used to pay down the loan further. The current amount of Brighten security deposits is $934,541.43.

33

(Pl.'s Ex. H) (emphasis added).

In his Declaration, Joshua Kocheck states that this email references the $3 million line of credit Aviv made available to Saber's operating entities on July 22, 2011.   (Defs.' Ex. X.)   He continues that this loan was made to Saber after they obtained necessary licenses to replace Brighten as operator, and "[r]ather than fund the loan from cash, . . . Aviv funded the $3 million Saber loan with the accounts receivables generated during the period that Brighten operated the facilities.   For purposes of internal accounting clarity and consistency, . . . Aviv reduced Brighten's debt by the amount of the funds used to make the $3 million Saber loan."   (Id.)

A genuine issue of material fact remains as to whether Saber's draw on this promissory note equates to an admission of liability.   On August 23, 2011, the amount Saber wished to draw on the loan from Aviv was $2,996,133.48.   Per the September 19, 2011 Reconciliation Schedule, the remaining outstanding amount on the Brighten Loan (apparently as of September 19, 2011) was $2,922,879.89.   Defendants have offered no explanation for why Saber drew on the loan in an amount so close to the Brighten loan amount, other than that the line of credit was made available to Saber "for their use in operating the skilled nursing facilities."   (Id.)   However, a plain reading of the August 23, 2011 memorandum would appear to indicate that the draw on the loan was taken for the purpose of repaying the then-current amount outstanding on Brighten's loan.   In any regard, this is a matter best left for the jury.

### c.  Adequate consideration

Last, Plaintiff contends that adequate consideration was not provided to Brighten, and

34

there were no provisions for Brighten's creditors.   According to Plaintiff, Saber took control of

the nursing home facilities, and used Brightens' accounts receivables for personal gain and benefit,

without providing any consideration to Brighten.   In contrast, Defendants aver that: (1) the only

agreement Brighten and Saber were parties to was the Management Agreement, which spelled out

the basis for Saber's compensation and only provided for managerial control; (2) Brighten

received adequate consideration from Aviv during the 2010 transactions; and (3) O'Connor

himself testified that there was consideration in earlier agreements.

After reviewing the record, this Court determines that adequate consideration was given

and provisions were made for creditors of the selling corporation.   In his deposition, O'Connor

testified that, in exchange for Aviv to replace Brighten as operator or a tenant in connection with

the initial loan documents and amendments, Brighten received "a lot of cash."   (O'Connor Dep.

193:6-194:19.)   The Operations and Transfer Agreements also memorialized the

acknowledgment of the "receipt and sufficiency" of "good and valuable consideration."   (Defs.'

Ex. M, D00478.)   The March, 1, 2011 Assignment and Assumption Agreement provides "in

consideration of the foregoing and the mutual covenants and promises contained in this

Assignment, and for other good and valuable consideration, the receipt and sufficiency of which

are hereby acknowledged by each Party. . ." (Pl.'s Ex. M., at D02662.); this contractual text is also

present in the Management Agreement.   (See Defs.' Ex. R, D01988.)   Moreover, the

Management Agreement contains the following provision under Article 6 on Financial

Arrangements:

> 6.1     Revenues and Expenses.  **In consideration for the services provided
> under this Agreement**, Manager shall be entitled to retain the excess of any
> revenues earned over expenses incurred during the term of this Agreement, and
> shall be responsible for any excess of expenses incurred over revenues earned, in
> the operation of the Facilities during the term of this Agreement, all as determined

in accordance with generally accepted accounting principles, consistently applied. (Defs.' Ex. R. at D01994) (emphasis added).

Based on this contractual record, this Court is satisfied that there was adequate consideration for the transaction, and provisions made for creditors; the adequate consideration exception therefore does not apply.

Nevertheless, this Court holds that, based on the preceding analysis, there are genuine issues of material fact remaining as to Plaintiff's successor liability claim relating to whether Saber implicitly agreed to assume liability for Brighten's debts. Therefore, Defendants' motion for summary judgment will be denied as to this claim.[17]

**B.  Civil Conspiracy**

To establish a civil conspiracy claim pursuant to Pennsylvania law, a plaintiff must establish: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.  Woodward v. ViroPharma Inc., 3222 EDA 2011, 2013 WL 1485110, at *11 (Pa. Super. Ct. Apr. 3, 2013). Here, Defendants challenge Plaintiff's civil conspiracy claim, averring it must fail because: (1) the claim is incompatible with the successor liability theory; (2) Aviv and Saber acted lawfully and properly; and (3) there is no underlying tort.

*1.  Incompatibility of Claims*

As a preliminary matter, Defendants argue that Plaintiff's civil conspiracy claim cannot stand because it is incompatible with its successor liability claims against Saber.  Under

---

[17]  This holding is applicable to the entirety of Plaintiff's successor liability claims.  Therefore, this Court need not discuss Plaintiff's argument that, in the alternative, Saber is liable for payment limited to services provided during March, 2011.

Pennsylvania law, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves."   Grose v. Procter & Gamble Paper Products, 2005 PA Super 8, 866 A.2d 437, 441 (Pa. Super. Ct. 2005) (quoting Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 211, 412 A.2d 466, 472 (1979)); see also Wells v. Thomas, 569 F. Supp. 426, 436 (E.D. Pa. 1983)("the 'combination of persons' who would have conspired to interfere with plaintiff's existing or prospective business relationships were all employees of [defendant]. As such, defendants are 'agents of a single corporation' who cannot conspire among themselves."); Johnson v. University of Pittsburgh, 435 F.Supp. 1328, 1370 (W.D.Pa.1977) (conspiracy among agents of a single entity, *i.e.,* the University of Pittsburgh, not sufficient to support a cause of action under § 1985(3) since agents of a single corporation cannot conspire among themselves); Keddie v. Pennsylvania State University, 412 F.Supp. 1264, 1276 (M.D.Pa.1976) (in action by nontenured professor against the University, its president, the dean of Liberal Arts College and five members of faculty committee, court dismissed claim for conspiracy under § 1985(3) reasoning that challenged conduct was essentially act of single entity; "A university cannot conspire with itself any more than a person or corporation can.").

This Court finds Defendants' position fruitless.   If Plaintiff had alleged in its Complaint that Brighten and Saber were the **only** two entities to enter into a civil conspiracy in the instant action, this Court would agree with Defendants' position.   In that instance, because the crux of Plaintiff's Complaint is that Saber and its related entities are Brighten's successors, the proposition that a single entity cannot conspire with itself would result in termination of this claim.   However, under its civil conspiracy claim, Plaintiff alleges that **all** Defendants "have entered into an express or implied agreement to use improper and/or unlawful means to acquire, transfer, and/or consolidate Defendant entities in an attempt to evade lawful debts of

Brighten-Bryn Mawr and Brighten-Ambler."   (Compl. ¶ 106.)   Thus, by its nature, Plaintiff's

civil conspiracy claim involves Brighten, Saber, **and** Aviv.   In this case, even assuming,

*arguendo*, that Brighten and Saber are determined to be "one entity" under a successor liability

theory, Plaintiff's allegations still refer to this "entity" separately conspiring with Aviv to effect

the current actions.   Therefore, at the very least, two entities ("Brighten/Saber" and "Aviv") are

alleged to have conspired together, as required under the cause of action; thus, the successor

liability and civil conspiracy claims are not incompatible.

　　*2.   Unlawful act*

　　As to the first element of a civil conspiracy claim, common purpose to do an unlawful act,

Defendants allege that Aviv and Saber acted lawfully and properly because, in collecting

Brighten's accounts receivable and contracting with Saber to manage the nursing homes and

replace Brighten as operator, Aviv merely exercised its rights as a first-priority secured lender

under the 2010 loan, lease, and credit and security agreements with Brighten.   Defendants also

aver that the arrangement whereby Brighten's healthcare receivables secured Brighten's debt to

Aviv is routine in the industry.   Plaintiff responds that Defendants Aviv and Saber committed

unlawful acts by violating Pennsylvania statutory law governing the operation and management of

long-term nursing facilities.

　　The Pennsylvania Health Care Facilities Act provides for the licensing of health care

facilities to "protect and promote the public health and welfare through the establishment and

enforcement of regulations setting minimum standards in the construction, maintenance and

operation of health care facilities."   35 Pa. Stat. Ann. § 448.801a (West).   Under the Act:

> No person shall maintain or operate or hold itself out to be a health care facility
> without first having obtained a license therefor issued by the department.   No

health care facility can be a provider of medical assistance services unless it is licensed by the department and certified as a medical assistance provider.

35 Pa. Stat. Ann. § 448.806 (West).

The Act also provides that the state may refuse to renew a license, or may suspend or revoke or limit a license for "lending, borrowing, or using the license of another, or in any way knowingly aiding or abetting the improper granting of a license."   35 Pa. Stat. Ann. § 448.811 (West).

Plaintiff contends that Defendants violated this provision of the Act by authorizing Aviv, through the Transfer Agreements, to utilize Brighten's nursing home license until such time as Aviv (or another operator designated by Aviv) obtained a license to operate the facilities.   It challenges that, on its face, the assignment of Brighten's license by Brighten to Aviv, and then to Saber, was a combination of two or more persons in furtherance of an unlawful act.   In response, Defendants contend that Plaintiff has misread the Operations Transfer Agreements, which merely required Brighten to cooperate in the transfer of the licenses to a new operator to the extent permissible, and to execute and file all forms needed to accomplish this end.   Moreover, according to Defendants, the Management Agreement engaged Saber to operate as Brighten's manager pending transfer of the license through the Department of Health or Saber's own licensing.   Defendants maintain that neither Saber nor Aviv borrowed or used Brighten's license.

The Operations Transfer Agreements between the Brighten entities and Aviv provided that, upon default, Brighten was to deliver, convey, and transfer "all intangible property, in which Operator has an interest, . . . such as Operator's licenses," to Aviv (Defs.' Ex. M, at D00478.) Importantly, the Agreements also explicitly state that:

To the extent permitted by law, Operator hereby authorizes New Operator to use Operator's nursing home license issued, as may be necessary, with respect to the operation of the Facility beginning on the Commencement Date, until New

39

> Operator receives a new nursing home license, at which time such authority shall
> lapse and new Operator shall forfeit such right.

(Id. at D00479.)

Per the Management Agreement, Saber's management of the Brighten facilities was to begin on

March 1, 2011, and would terminate on the date that each Saber affiliate, *inter alia*, obtained a

license for the operation of the applicable facility.   (Defs.' Ex. R, D01989.)

This Court agrees with Plaintiff, and holds that a genuine issue of material fact exists as to

whether Brighten, Saber, and Aviv's acts pursuant to the Operations Transfer Agreement

established a combination of two or more persons in furtherance of an unlawful act.   Under the

Act, no person shall maintain or operate a health care facility without first obtaining a state issued

license.   Pursuant to the language of the Operations Transfer Agreement, Aviv was permitted to

use Brighten's license, as necessary, from the date of default, to the date it received a new license.

On February 16, 2011, Aviv declared default under the Master Lease.   On March 1, 2011, the

same day Brighten and Saber entered into the Management Agreement, Aviv assigned its rights

under the Operations Transfer Agreement, including its right to use Brighten's license, to Saber.

It is undisputed that, pending receipt of the necessary licenses in or around July 1, 2011, Saber

commenced management responsibilities for the Bryn Mawr and Ambler facilities, although

Brighten was still, ostensibly, the legal operator of the facilities.   It is therefore evident that a

factual issue remains as to whether Saber's management of the Brighten facilities from March 1,

2011-July 1, 2011, while Brighten was still the legal licensee, was in violation of Pennsylvania

statute, and whether Saber and Aviv conspired, pursuant to contractual agreement, to effect this

unlawful act.   The second and third elements of a prima facie case for civil conspiracy are also

satisfied in that the signing of the agreements, subsequent transition of affairs, and Saber's

40

management period pursuant to the Operations Transfer Agreements and Assignment Agreements constituted an overt act, and actual legal damage occurred in that Plaintiff has suffered actual legal damage caused by Defendants' refusal to pay its outstanding invoices.[18][19]

### 3. *Underlying Tort*

Defendants also argue that Plaintiff's civil conspiracy claim cannot stand because there is no underlying tort, a prerequisite for a civil conspiracy cause of action.   In response, Plaintiff contends that Saber tortiously interfered with the agreement between Brighten and Plaintiff, thereby satisfying the underlying tort requirement.[20]

A civil conspiracy claim requires an underlying tort.   Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008) (citing Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 405 (3d Cir.2000)).   Civil conspiracy, though typically not an independent cause of action, is a "mechanism for subjecting co-conspirators to liability when one of their member[s] committed a tortious act"; therefore, a plaintiff need not allege an underlying tortious claim against every co-conspirator.   See Smith v. Berg, 247 F.3d 532, 539 (3d Cir. 2001) (quoting Beck v. Prupis, 529 U.S. 494, 503, 120 S. Ct. 1608, 146 L.Ed.2d 561 (2000)).

---

[18]  This Court agrees with Plaintiff that the issue in the current instance is distinguished from the point at issue cited in cases by Defendants, in which courts have recognized the right for healthcare receivables to secure debt. Plaintiff's position does not rely simply on whether Aviv has the right to exercise its rights as a secured creditor in the instant case.   Instead, the crux of Plaintiff's claim is that, aside from any valid exercise of secured interests, Brighten and Aviv acted in concert, in violation of Pennsylvania statute, to use Brighten's default to take away Brighten's authority over the facilities, although it was still the licensed operator, while simultaneously allowing Saber to operate Brighten's facilities under Brighten's license.

[19]  This Court also finds Defendants' citation to 28 Pa. Code § 201.14(b) to be unpersuasive because it is predicated upon the legal licensee having the agency to comply with the statute, and that Saber acted in a managerial capacity during the transition period, factual issues remaining in this case.

[20]  Because it is unclear from the briefings whether Plaintiff contends that violations of Pennsylvania's Health Care Facilities Act in the instant case are the underlying tort, or if its analysis of these regulatory violations is meant only to speak to satisfaction of the elements of a civil conspiracy claim, this Court will proceed only with the tortious interference examination.

To establish a claim for tortious interference with contract, a plaintiff must show: (1) the existence of a contractual relationship between the plaintiff and a third party, (2) purposeful action on the part of the defendant intended to harm the relationship, (3) the absence of privilege or justification on the part of the defendant, and (4) actual damages resulting from the defendant's conduct.   Stoeckinger v. Presidential Fin. Corp. of Delaware Valley, 2008 PA Super 95, 948 A.2d 828, 834 (Pa. Super. Ct. 2008) (citing Hillis Adjustment Agency, Inc. v. Graham Co., 911 A.2d 1008, 1012 (Pa.Super.2006)).   According to Plaintiff, the elements of the claim are satisfied because (1) a valid contract existed between it and Brighten; (2) Defendants purposefully acted to subvert that relationship through the unlawful assignment of Brighten's license to operate the facilities; (3) there was no valid justification pursuant to the Act; and (4) Plaintiff suffered substantial legal damage.   This Court finds that, based on a review of the record and its foregoing analysis, Plaintiff has made a prima facie showing of tortious interference.   There was a valid contract between Plaintiff and Brighten, and Defendants allegedly engaged in purposeful action to harm this relationship, mainly, the alleged unlawful assignment of Brighten's license to Saber.   In addition, Defendants had no justification or privilege,[21] and Plaintiff suffered actual damages because it is still left unpaid in full for services provided.   Plaintiff has therefore carried its burden as to this point.

4. *Gist of the Action*

Last, Defendants allege that because Plaintiff's allegations against it flow from, and are entirely dependent upon, the underlying contractual relationship between Plaintiff and Brighten,

---

[21]  Defendants aver that Plaintiff has not proven that Defendants' conduct was without privilege or justification, a necessary element of a tortious interference claim.   Defendants posit that acting to enforce and preserve collateral is fully within the recognized privilege or justification that defeats any tortious interference claim, and cite a number of cases to support this proposition.   However, as discussed, *supra*, the foundation of Plaintiff's claim is not merely Aviv's rights vis-à-vis his security interest in Brighten's collateral.   Rather, the issue instead is tied to whether Saber and Aviv engaged in, among other things, violations of Pennsylvania law.

the gist of the action doctrine bars any tort claims on the facts of this case; in this case, this would

bar the tortious interference claim that underlies the civil conspiracy cause of action.

Under the "gist of the action" standard, "Pennsylvania intermediate courts have held that plaintiffs

may not recast ordinary breach of contract claims into tort claims."[22]   Harold ex rel. Harold v.

McGann, 406 F. Supp. 2d 562, 576-77 (E.D. Pa. 2005).   "When a plaintiff alleges that the

defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania

courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract

or tort." Pennsylvania Manufacturer's Association Insurance Co. v. L.B. Smith, Inc., 831 A.2d

1178, 1182 (Pa.Super.2003).   "Tort actions lie for breaches of duties imposed by law as a

matter of social policy, while contract actions lie only for breaches of duties imposed by mutual

consensus agreements between particular individuals."   Hart v. Arnold, 884 A.2d 316, 339

(Pa.Super.2005); Pittsburgh Construction Co. v. Griffith, 834 A.2d 572, 581 (Pa.Super.2003),

appeal denied, 578 Pa. 701, 852 A.2d 313 (2004).   "[A] tortious interference with contract claim

that coincides directly and **solely** with a contractual prohibition on the identical activity will fall

within the gist-of-the-action doctrine.   ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.,

3:CV-11-02213, 2012 WL 6537994 (M.D. Pa. Dec. 14, 2012) (emphasis added) (citing Brown &

Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 621-22 (E.D. Pa. 2010)).   Although a breach of

contract may potentially give rise to an actionable tort, the wrong ascribed to the defendant in

---

[22]  Although the Pennsylvania Supreme Court has not officially adopted the "gist of the action" test, both the
Pennsylvania Superior Court and the Eastern District of Pennsylvania have predicted that it would.   See Air Products
and Chemicals, Inc. v. Eaton Metal, 256 F.Supp.2d 329, 340 n.11 (E.D.Pa.2003) ( citing eToll, Inc. v. Elias/Savion
Advertising, Inc., 811 A.2d 10, 14 (Pa.Super.2002); see also Bash v. Bell Tel. Co. of Pennsylvania, 411 Pa.Super.
347, 601 A.2d 825 (1992); Asbury Auto. Group LLC v. Chrysler Ins. Co., No. Civ. A. 01–3319, 2002 WL 15925 at
*3 n. 3 (E.D.Pa.2002); Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F.Supp.2d 826, 833 n. 11
(E.D.Pa.2000).   The Third Circuit has also considered this doctrine.   See Pediatrix Screening, Inc. v. TeleChem
Int'l, Inc., 602 F.3d 541, 548 (3d Cir. 2010).

tort must be the gist of the action, the contract being collateral.    eToll, Inc. v. Elias/Savion

Adver., Inc., 2002 PA Super 347, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting Bash v. Bell Tel.

Co. of Pennsylvania, 411 Pa. Super. 347, 355, 601 A.2d 825, 829 (1992)).   In eToll, the Superior

Court of Pennsylvania determined that, generally, courts have held that the "gist of the action"

doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the

duties allegedly breached were created and grounded in the contract itself; (3) where the liability

stems from a contract, or (4) where the tort claim essentially duplicates a breach of contract claim

or the success of which is wholly dependent on the terms of a contract.    eToll, A.2d at 19.

     In the instant matter, both parties agree that Tender Touch and Brighten were parties to the

contract, and that Tender Touch never entered into a service agreement with Saber or Aviv.   By

its very nature, therefore, the instant tort claim cannot arise solely from any contract between the

Plaintiff and **all** Defendants.   Moreover, this Court agrees with Plaintiff that its underlying

tortious interference with contract claim is not limited to issues governed by the contract, which

does not account for the allegation that Aviv and Saber tortiously interfered with the

between Plaintiff and Brighten by unlawfully assigning Brighten's license to Saber.   Because

Aviv and Saber were not parties to the contract, and the contract does not provide for this type of

potential breach, it would be incredulous for this type of tortious conduct to be considered as

stemming or grounded in the contract itself.   This Court therefore holds that the gist of the action

doctrine does not bar Plaintiff's civil conspiracy claim's underlying tort of tortious interference

with contract.   Thus, Defendants' motion is denied as to Plaintiff's civil conspiracy claim.

## IV.    CONCLUSION

     For the reasons set forth above, Defendants' Motion for Summary Judgment is denied in all

respects.[23]   An appropriate Order follows.

---

[23]  This Court also has determined that Defendants' public policy argument, addressed for the first time in its Reply, does not form the basis for a grant of summary judgment.